# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| LOUISE DAVENPORT,<br>     **Plaintiff,** | ) | **Case No. 03 C 9301** |
| | ) | |
| v. | ) | **Judge Joan Lefkow** |
| | ) | **Magistrate Judge Geraldine Soat Brown** |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
|      **Defendant.** | ) | |
| | ) | |

To:    The Honorable Joan Lefkow
       United States District Court Judge

## REPORT AND RECOMMENDATION

Geraldine Soat Brown, United States Magistrate Judge

Plaintiff Louise Davenport ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423(d), and supplemental security insurance under Title XVI of the Social Security Act, 42 U.S.C. § 1382c(a)(3). The Commissioner seeks summary judgment affirming the denial of disability benefits. [Dkt 19.] The Plaintiff has filed a cross-motion seeking summary judgment reversing the Commissioner's decision and directing the Commissioner to award benefits to Plaintiff. [Dkt 24.] The District Judge referred the motions to this court for a Report and Recommendation. [Dkt 20.] For the following reasons, this court respectfully recommends that the Commissioner's motion for summary judgment be denied, the Plaintiff's motion for summary judgment be granted, and the case be remanded for further proceedings consistent with this decision.

## PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on July 26, 2001.[1] (R. 96-98.) Plaintiff's claims were denied initially and upon reconsideration. (R. 74-83, 257-60.) Plaintiff requested a hearing on April 25, 2002, and a hearing was held before an Administrative Law Judge ("ALJ") on October 3, 2002. (R. 84, 264-300.) The ALJ issued an unfavorable decision on February 18, 2003 (R. 38-47), and the Appeals Council declined Plaintiff's request for review (R. 9-11), thereby making the ALJ's decision the final decision of the Commissioner.

## BACKGROUND

Plaintiff was born on November 24, 1966 and was 34 years old at the time of the hearing. (R. 101.) She has a college degree in communications. (R. 273.) Plaintiff's past work experience consists of serving as a loan department secretary at a bank, an administrative assistant at a bank, and in various data entry positions. (R. 107.) Specifically, from September 1994 to January 1996, Plaintiff worked in an administrative/data entry capacity for various employers as a temporary employee. (R. 119.) She answered telephones, inputted data, distributed daily mail, and typed documents. (R. 123.) From September 1996 to June 1997, Plaintiff worked as an administrative assistant at a bank. (R. 119.) In that position, she was responsible for inputting data into spreadsheets using Excel and Lotus. (R. 121.) Plaintiff's last employment was as a loan department secretary at a bank from June 1997 to May 1999. (R. 119.) In that position, Plaintiff ran credit

---

[1]The regulations regarding DIB and SSI are substantially similar and where they do not significantly differ, only one section will be cited. *See Ashpaugh v. Apfel*, No. 98 C 6561, 2000 WL 1222153 at *1 n. 3 (N.D. Ill. Aug. 22, 2000) (Ashman, M.J.).

reports, maintained the copier, maintained the credit files, answered telephones, and compiled the monthly status report. (R. 120.) Plaintiff testified that, at the time of the hearing in 2002, she and her daughter were living in Plaintiff's car. (R. 272, 289.)

## A.   Medical Evidence

Plaintiff alleges that she became disabled on May 7, 1999, due to difficulty breathing, chest pain, back pain, leg pain, arm pain, fatigue, headaches, dizziness, nausea, insomnia, and stiffness. (R. 78, 106.) Plaintiff has also experienced difficulty with the vision in her left eye. (R. 242-43.)

Progress notes from Saint Mary of Nazareth Hospital Family Practice Center ("St. Mary") from December 1997 through February 1999 indicate that Plaintiff complained of headaches, nausea, dizziness, chest pain, and back pain. (R. 169, 171, 173-74, 176-77.) Plaintiff was diagnosed with tension headaches (R. 172-76), and was prescribed Fiorinal[2] and BuSpar[3] (R. 171-72, 177). While being treated at Saint Mary's, Plaintiff was given a head MRI on July 28, 1998 (R. 178), and a chest x-ray (R. 179). The chest x-ray results were within normal limits, but showed a suggestion of hyperinflation[4]. (R. 179.) The head MRI showed some abnormalities and Plaintiff was referred to a neurologist. (R. 178.) The record does not included any medical records from a neurologist.

Plaintiff was seen in the emergency room of Cook County Hospital on March 15, 2001, complaining that she had been hit by a male neighbor. (R. 180.) She subsequently returned to Cook

---

[2] Fiorinal is a drug used to treat tension headaches. J. E. Schmidt, *Attorneys' Dictionary of Medicine*, Vol. 2, F-95 (Matthew Bender, December 2003).

[3] BuSpar is a drug used to relieve anxiety. *Id.* at Vol. 1, B-241.

[4] Hyperinflation is the condition of being overdistended or overinflated, as the bladder or the lung. *Id.* at Vol. 3, H-234.

County Hospital in April 2001, and progress notes through July 2001 indicate Plaintiff complained

of back pain, chest congestion, difficulty breathing, and stiffness in her knees, ankles and hips. (R.

182-95.) Plaintiff was treated for hypertension (R. 182-86), and prescribed Hydrochlorothiazide[5]

and Atenolol[6] (R. 182-83, 185). While being treated at Cook County Hospital, Plaintiff was given

an echocardiogram on July 16, 2001, and chest x-ray on May 22, 2001. (R. 186-88, 191-95, 198.)

The echocardiogram showed normal results (R. 187, 192-95), and the chest x-ray showed that

Plaintiff's lungs and heart were within normal limits. (R. 191, 198.) However, the chest x-ray

showed prominent hila[7], and a follow up chest x-ray was suggested. (*Id.*) On August 1, 2001,

Plaintiff had a chest CT-scan at Cook County Hospital's Fantus Health Center ("Fantus"), which

showed findings consistent with a granulomatous[8] process such as sarcoidosis[9] or TB[10]. (R. 230.)

---

[5] Hydrochlorothiazide is a drug used in the treatment of high blood pressure and edema (in congestive heart failure). *Id.* at Vol. 3, H-202.

[6] Atenolol is the generic name for a medicinal substance used to treat hypertension or high blood pressure. *Id.* at Vol. 1, A-592.

[7] Hila are the parts of certain organs, as the kidneys, lungs, spleen, etc., where the nerves and blood vessels (arteries and veins) enter and leave. *Id.* at Vol. 3, H-142.

[8] A granuloma is a small, abnormal mass or lump composed of inflammatory cells. *Id.* at Vol. 3, G-142. A granuloma forms as the body's response to infections and various irritants. *Id.* Granulomatosis is the development of multiple granulomas or a condition marked by the presence of several granulomas. *Id.* at G-143.

[9] Sarcoidosis is a disease of unknown cause marked by the formation of granulomas in various organs or tissues of the body. *Id.* at Vol. 5, S-28. Although the cause is unknown, alterations in the immune system play a part in the disease. *Id.* It can subside spontaneously or progress and manifest severe impairment of function in various affected organs. *Id.*

[10] TB is an abbreviation for tuberculosis. *Id.* at Vol. 5, T-27. Tuberculosis is a contagious disease caused by infection with the bacteria of the species *Mycobacterium tuberculosis*. *Id.* at Vol. 6, T-276. The disease is characterized by the formation in the tissues involved of small masses (tubercles) and by the destruction of tissue. *Id.* at 276-77.

4

Clinical correlation was suggested at that time. (*Id.*)

On October 2, 2001, Plaintiff underwent a psychiatric evaluation by Dr. Allen Nelson in connection with her claim at the request of the Bureau of Disability Determination Services ("DDS"). (R. 248-51.) Dr. Nelson summarized his findings:

> The claimant is an individual with several physical problems and symptoms, which are described in the present illness. It was very difficult to obtain a reliable psychiatric history from her, as her answers to my questions were generally quite vague and ambiguous. When I asked her if she was depressed or nervous, she basically replied that she did not know, but on further description, it appears that she does experience sporadic depressive and anxiety episodes as well as some difficulties concentrating, chronic insomnia, and a poor appetite. She has also undergone a significant social withdrawal. She described all of her mental problems, which she tended to minimize this, based on external circumstances such as being betrayed by old friends and family members in a variety of ways that were difficult for her to explain, and her current living situation where she feels harassed by neighbors and the electricity was shut off several weeks ago. She has never received any form of psychiatric treatment. A question that remains with this case is how many of her allegations of betrayal and harassment, etc. are based on reality or how many are products of an increasingly paranoid state of mind. (R. 250.)

Plaintiff also underwent a physical evaluation by Dr. Scott Kale on October 2, 2001, in connection with her claim. (R. 252-55.) Dr. Kale noted Plaintiff's complaints of progressive shortness of breath with minimal exertion, face pain in the area of both frontal sinuses and fullness in her nose, arm and leg pain, stiffness, and back pain. (R. 252-53.) Dr. Kale noted that Plaintiff has a history of sickle-cell trait,[11] but has no history of pulmonary edema[12] or pulmonary

---

[11] Sickle-cell trait is an inherited condition in which there is a tendency for the production of sickle cells in the blood. *Id.* at Vol. 5, S-146-47. There is an increased risk of thrombosis (formation of clots in the blood stream), but usually there is not enough anemia to produce the classical picture of sickle cell anemia. *Id.*

[12] Pulmonary Edema is a seepage of fluid into the tiny air sacs of the lungs and into the tissue forming the framework of the lungs, with a resulting shortness of breath and congestion. *Id.* at Vol. 5, P-527-28. It is usually due to a malfunction of the heart. *Id.*

embolism[13]. (R. 252.) Dr. Kale noted that Plaintiff denied chest pain or palpitations. (*Id.*) Dr. Kale

noted that Plaintiff's blood pressure at the time of the examination was 140/80. (R. 253.) Dr. Kale

stated that Plaintiff's vision was 20/20, her pupils were equal and reactive to light, fundi were

benign, her extraocular eye motions were intact, her visual fields were intact, and sclerae were non-

icteric and non-injected. (*Id.*) Dr. Kale indicated low backache and probable chronic sinusitis. He

also stated that primary pulmonary hypertension[14] and myopathy[15] should be explored to be ruled

out. (R. 255.) Dr. Kale noted that myopathy can cause restrictive defect to explain Plaintiff's

pulmonary function and shortness of breath. (*Id.*) Dr. Kale opined that an echocardiogram and CT-

scan of Plaintiff's lung were needed to rule out myopathy. (*Id.*) Dr. Kale further opined that

Plaintiff's activities of daily living were diminished perhaps due to primary pulmonary hypertension

or possible sickle-cell trait related arthropathies[16]. (*Id.*) Dr. Kale stated that additional information

was required to make these determinations, but that the additional testing had been ordered by

Plaintiff's doctors at Cook County. (*Id.*)

Plaintiff went to Cook County Hospital's emergency room on October 24, 2001, complaining

of chest pain and shortness of breath. (R. 228-29.) A chest and leg x-ray were taken, and Plaintiff

was diagnosed with probable sarcoidosis. (*Id.*) Plaintiff was prescribed Hydrochlorothiazide. (R.

229.)

---

[13] Pulmonary Embolism is the obstruction of an artery in a lung by an embolus or blood clot (usually from a vein in a leg). *Id.* at Vol. 5, P-529.

[14] Pulmonary Hypertension is increased blood pressure in the pulmonary circulation (the blood circulating from the right ventricle through the lungs and into the left atrium). *Id.* at Vol. 5, P-531.

[15] Myopathy is a disease of a muscle or muscles. *Id.* at Vol. 4, M-340.

[16] Arthropathy describes any disease of a joint or of joints. *Id.* at Vol. 1, A-550.

On October 30, 2001, Dr. Carl Hermsmeyer, a state agency psychologist, reviewed the evidence and opined that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation due to mental impairments. (R. 213.) Dr. Hermsmeyer opined that Plaintiff has an adjustment disorder[17] with mixed emotional features. (R. 201.) He opined that she is capable of performing simple tasks. (*Id.*)

On November 5, 2001, Dr. Kim, a state agency medical consultant, reviewed the evidence. (R. 217-24.) Dr. Kim noted that Plaintiff has a history of low backache, chronic sinusitis, sickle cell trait, shortness of breath with no cardiac basis, and an adjustment disorder with depression. (R. 218-19.) Dr. Kim opined that Plaintiff could perform work involving lifting 20 pounds occasionally, lifting 10 pounds frequently, standing or walking for about six hours in an eight hour workday, and sitting about six hours in an eight hour workday. (R. 218.) Dr. Kim also found that Plaintiff could climb stairs and ramps frequently, climb ladders, ropes and scaffolds occasionally, and could occasionally stoop, kneel, crouch or crawl. (R. 219.) However, Dr. Kim opined that Plaintiff must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dust, gases, poor ventilation, and heights. (R. 221.)

On July 1, 2002, Plaintiff was seen at the Lower West Side Neighborhood Center with complaints of swollen ankles, shortness of breath, leg pain, chest pain, frequent urination, pain, redness and light sensitivity in her left eye, increased appetite, tingling in her feet (mainly left), headaches, dizziness, burning in her stomach, arm pain, and fatigue. (R. 244-47.) In August and

---

[17] Adjustment disorder is the lack of normal ability to adjust to or cope with an environmental stress without developing symptoms, such as depression, anxiety, disturbance in behavior, etc. *Id.* at Vol. 1, A-160.

September 2002, Plaintiff was treated at Fantus for left eye inflammation associated with sarcoidosis, with decreased left eye visual acuity. (R. 233-43.) On August 2, 2002, Plaintiff went to Cook County Hospital's emergency room complaining of eye pain. (R. 225-227.) On August 3, 2002, Plaintiff returned to Cook County Hospital's emergency room again complaining of eye pain, photophobia, blurred vision, and an inability to open her left eye. (R. 242.) Plaintiff was diagnosed with iritis[18] of the left eye and referred to an ophthalmologist. (R. 242-243.) Plaintiff was prescribed Atropine Sulfate[19] eye drops. (R. 234.)

On August 8, 2002, Plaintiff was referred to the pulmonary clinic because a chest x-ray/chest CT-Scan showed findings consistent with sarcoidosis. (R. 235.) Laboratory work conducted in August 2002, showed normal results in toxicology, hematology, and anti-nuclear antibodies, including a negative result on an ANA Screen[20]. (R. 231.)

## B.    Plaintiff's Testimony

Plaintiff was not represented by counsel at the hearing before the ALJ. (R. 41, 266-67.) At the hearing, she testified that she has experienced problems walking, stiffness in her back and legs, swelling in her ankles and legs, headaches, and shortness of breath. (R. 283.) She testified that she was living in her car. (R. 272.)

---

[18] Iritis is inflammation of the iris, the circular "curtain" of the eye, the central opening which forms the pupil. *Id.* at Vol. 3, I-199.

[19] Atropine Sulfate is a drug used to relax smooth muscle, to relieve tremor of parkinsonism, to increase heart rate, and to enlarge the pupil. *Id.* at Vol. 1, A-611.

[20] ANA is an abbreviation for antinuclear antibodies. *Id.* at Vol. 1, A-321. An ANA Screen looks for these antibodies. Antinuclear antibodies are any antibody (protective protein) having an affinity for nuclei of cells. *Id.* at A-445. It is found in the serum of patients with systemic lupus erythematosus, autoimmune chronic active hepatitis, and rheumatoid arthritis. *Id.*

Plaintiff testified that she left her job as a secretary in May 1999 because her position was eliminated and she has not worked since then. (R. 273-74.) Plaintiff testified that she could perform the functions of a secretary, clerk or data entry position, however she is unsure if she would be able to work every day. (R. 274-75.) She testified that she would not be able to sit all day because she experiences stiffness when she sits for long periods of time. (R. 275.)

Plaintiff testified that in February 1999, Dr. Sanchez ordered a stress test because she thought Plaintiff had angina [21], and prescribed BuSpar because Dr. Sanchez concluded that Plaintiff's problems were stress related. (R. 280-81.) However, Plaintiff testified that she has not received any other treatment for stress. (R. 282-83.) She has not seen a counselor or taken any anti-anxiety medication. (*Id.*) Plaintiff testified that she does not believe her problems are stress related. (R. 283.) Plaintiff testified that in March 1999, she went to the emergency room because the BuSpar caused her to breathe really fast. (R. 281.) She was diagnosed with hyperventilation syndrome and given two shots of Ativan[22]. (*Id.*)

Plaintiff testified that she went to the Cook County Westside Clinic after a referral in April 2001, to be tested for possible blood in her urine, but the urine test was not performed. (R. 279.)

Plaintiff testified that in April 2001, Dr. Matthews told her that her blood pressure was high and prescribed Hydrochlorothiazide. (R. 182-83, 185, 279; Pl.'s Answer at 3.) In May 2001, Plaintiff had a chest x-ray, which produced normal results. (R. 279-80.) She then had an echocardiogram, which produced borderline results, a chest CT-Scan, which showed probable

---

[21] Angina is an attack of choking and suffocation which may result from any number of causes. *Id.* at Vol. 1, A-358.

[22] Ativan is a medication used to relieve anxiety. *Id.* at Vol. 1, A-595.

sarcoidosis or possible TB and a TB skin test that was negative. (R. 280.) Plaintiff testified that Dr. Matthews prescribed Atenolol for hypertension and angina. (*Id.*) Plaintiff also testified that she was given an ANA test to detect rheumatoid arthritis.[23] (R. 293.) The ALJ told Plaintiff that her ANA factor was normal. (R. 294.)

Plaintiff testified that on July 1, 2002, she saw Dr. Arenador at the Chicago Department of Health's Lowelless Eye Clinic. (R. 282.) She testified that Dr. Arenador said she had high blood pressure and prescribed 300 milligrams of Aveapro.[24] (*Id.*) Plaintiff testified that she took this medication for five days, but stopped because it made her feel worse. (*Id.*) Plaintiff testified that on July 29, 2002, she returned to see Dr. Arenador and was prescribed Aceon[25]. (*Id.*) Plaintiff testified that she did not fill the Aceon prescription because Dr. Arenador told her it could cause coughing. (*Id.*) She testified that she did not return to the clinic. (*Id.*)

Plaintiff testified that she was treated at Cook County Hospital and Fantus for her eye problem. (R. 276.) She testified that when she was first diagnosed with iritis, her left eye was closed and would only open with force. (R. 277.) She testified that her condition had improved because initially she could not see at all. (R. 277-78.) At the time of the hearing, Plaintiff testified that she could see, even though her vision was not 20/20, or back to normal, and was still blurry. (R. 278.) Plaintiff testified that Cook County referred her to the pulmonary clinic for a lung function test, but

---

[23] Rheumatoid arthritis is a form of chronic arthritis usually affecting several joints, characterized by inflammation of the lining membranes, atrophy (wasting) and thinning of the bone substance, and eventually by stiffening and deformity of the joints. *Id.* at Vol. 5, R-143-44.

[24] Avapro is a name brand for irbesartan. Irbesartan is an angiotensin-converting enzyme inhibitor (ACE inhibitor) used in the treatment of hypertension. *Id.* at Vol. 3, I-195-96.

[25] Aceon is an ACE inhibitor used to treat hypertension. *Id.* at Vol. 1 (Nov. 2004 Supplement at 3).

she had not yet received an appointment for the testing, and was scheduled for an evaluation on October 18, 2002. (R. 276-77.)At the time of the hearing, Plaintiff was using prescription eye drops for iritis, but was not taking any other medication for her symptoms other than an occasional dosage of Ibuprofen. (R. 277-78, 287.) At the time of the hearing, she was not being treated for sarcoidosis or for her lungs. (R. 276.)

When asked about her current pain and symptoms, Plaintiff responded that the chest pain is the most troubling. (R. 284.) Plaintiff testified that the chest pain scares her because she sometimes has to stop whatever she is doing. (*Id.*) She testified that Dr. Arenador told her to take aspirin, but aspirin makes her nauseous and causes a burning sensation in her stomach. (*Id.*) She testified, however, that she takes aspirin when the chest pain becomes severe. (*Id.*) Plaintiff testified that she has chest pain every day and the pain is constant, but it is more like a pressure. (R. 284-85.) Plaintiff testified that she also experiences pain in her lower back, knees, hips, and ankles. (R. 285-86.) She stated that she has trouble walking because of these symptoms. (*Id.*) Plaintiff testified that she also experiences headaches. (R. 286.) Plaintiff stated that she has pain or numbness in her elbows, hand, wrist, fingers, neck, and shoulders. (*Id.*) She testified that she relieves these pains with massages, rubbing them with alcohol, and sometimes by taking Ibuprofen. (R. 287.)

Plaintiff testified that she can walk one block before she must rest. (*Id.*) She can stand for about half an hour. (R. 288.) She can sit for a couple of hours, but has to stretch. (*Id.*) She can lift 10 pounds. (*Id.*) When asked about her typical day, Plaintiff responded that in the morning she drives to Dominick's to use the bathroom and then she goes to the park. (R. 289.) While at the park, Plaintiff feeds the birds, reads the newspaper, and listens to the radio. (*Id.*) She stays at the park from about 10:30 to 1:00, and then goes to the library until 5:00. (*Id.*) After she leaves the library,

11

Plaintiff goes to Dunker's Park and Garfield Park until about 9:00 p.m. (*Id.*)


## C.     Vocational Expert's Testimony

Frank Mendrick, a vocational expert ("VE"), testified at Plaintiff's hearing. (R. 295-300.) The VE characterized Plaintiff's past relevant work as a secretary as medium and semi-skilled, even though it is almost universally done in the economy at a light or sedentary level. (R. 296.) The VE characterized Plaintiff's past experience as an administrative assistant as sedentary and semi-skilled. (*Id.*) The VE characterized Plaintiff's past experience as a general office clerk as sedentary and semi-skilled. (*Id.*) The VE noted that Plaintiff had worked in three different data entry positions. (*Id.*) In two of these data entry positions, Plaintiff did not lift anything and the VE characterized them as sedentary and semi-skilled. (R. 296-97.) However, the third data entry position, in which Plaintiff carried reams of paper, lifting up to 30 pounds, was characterized as medium and semi-skilled. (*Id.*) The VE characterized Plaintiff's past experience as a mail clerk as light and semi-skilled. (R. 297.)

The VE testified that a person of Plaintiff's age, education and work experience, who could sit for six hours, stand and walk for six hours, lift and carry up to 20 pounds occasionally and 10 pounds frequently, could only occasionally stoop and crawl, could only occasionally climb ladders, ropes, and scaffolds, could only occasionally crouch or kneel, must avoid concentrated exposure to activities involving unprotected heights, must avoid concentrated exposure to dust, odors, fumes, and gasses, temperature extremes, humidity and wetness, and is limited to simple and unskilled jobs would be precluded from performing her past relevant work. (R. 297-98.) The VE testified that, based on her limitations, Plaintiff would be able to perform light and sedentary jobs, such as a

cashier, general assembly work, and general inspection. (R. 298.) Specifically, the VE stated that cashier jobs exist at both the light level (15,000 jobs) and the sedentary level (4,000 jobs); that general assembly work exists at both the light level (10,000 jobs) and the sedentary level (3,500 jobs); and that general inspection work exists at both the light level (5,000) and the sedentary level (1,000). (*Id.*) The VE testified that a person who required an option to sit and stand approximately every hour would still be able to perform these jobs. (*Id.*)

## THE ALJ'S DECISION

The Social Security Regulations ("Regulations") prescribe a sequential five-part test for determining whether a claimant is disabled. 20 C.F.R. § 416.920. Under this test the Social Security Commissioner must consider: (1) whether the claimant has performed substantial gainful activity during the period for which she claims disability; (2) if she has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functioning capacity ("RFC"), despite her impairment, to perform her past relevant work; and (5) if the claimant cannot perform her past relevant work, whether the claimant is able to perform any other work existing in significant numbers in the national economy, considering her RFC together with her age, education, and work experience. *Id.*; *see also Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof at steps one through four; the burden shifts to the Commissioner at step five. *Young*, 957 F.2d at

389.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset of disability date. (R. 42.) At step two, the ALJ found that Plaintiff's condition produced "severe" limitations. (*Id.*) At step three, the ALJ concluded that Plaintiff's condition does not meet the requirements or equal the level of severity contemplated for one of the impairments listed in 20 C.F.R. Pt. 404, Subpt P, App. 1. (*Id.*) At this step, the ALJ found that Plaintiff's depression does not satisfy section 12.04 because her depressive syndrome resulted only in "'mild' restrictions of activities of daily living; 'moderate' difficulties in maintaining social functioning; 'moderate' difficulties in maintaining concentration, persistence or pace; and 'none' with respect to repeated episodes of decompensation, each of extended duration." (R. 43.) The ALJ further stated that Plaintiff's depression does not have a medically documented history of chronic affective disorder of at least two years' duration. (*Id.*) The ALJ concluded that "[e]ven considering the combination of the claimant's impairments, the level of severity does not equal that contemplated for any of the Appendix 1 impairments. Disability, therefore, cannot be established at the third step of the sequential evaluation." (*Id.*)

Between steps three and four, the ALJ assessed Plaintiff's RFC. (R. 42-43.) As the ALJ described, the RFC is "what the claimant can still do in spite of her limitations." (R. 43.) In her assessment of Plaintiff's RFC, the ALJ noted that Plaintiff's "medically determinable impairments preclude the following work-related activities: lifting more than 20 pounds occasionally or more than 10 pounds frequently; stooping, crawling, crouching, and kneeling more than occasionally; climbing ropes, ladders, or scaffolds more than occasionally; concentrated exposure to activities involving unprotected heights; performing jobs in environments containing respiratory irritant(s) in

concentrated levels; concentrated exposure to extremes of heat, cold or humidity and wetness; and understanding, remembering and/or carrying more than simple, unskilled instructions." (*Id.*) The ALJ summarized Plaintiff's symptoms and complaints as periods of fatigue and insomnia; bouts of nausea that make eating difficult; and frequent headaches that prevent Plaintiff from doing many activities, including reading. (*Id.*) In looking at the medical evidence, the ALJ concluded that "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations. More specifically, the medical findings do not support the existence of limitations greater than those reported above." (*Id.*) In reaching that conclusion, the ALJ stated that the 1998 medical records detailed complaints of headaches, dizziness, and nausea, but tests and examinations showed no abnormalities. (R. 44.) The ALJ further stated that the medical records from Cook County detailed varying complaints, including headaches, fatigue, dizziness, back pain, and possible heart difficulties. (*Id.*) The ALJ stated that even though the Plaintiff has hypertension, the medical reports indicate that the condition is under control. (*Id.*) The ALJ stated that Plaintiff's pulse was 98-99 at rest, and while walking her heart rate was 105. (*Id.*) The ALJ noted that the echocardiogram from July 2001 showed four normal chambers, with normal left valve functions and no effusion or thickening. (R. 44, 193-94.) The ALJ stated that the tests and lab work, overall, failed to show positive readings. (R. 44.) The ALJ stated that while an "August 1, 2001 CAT scan indicates findings consistent with sarcoidosis (Exhibit 12F), the remaining August lab work from Cook County was negative (Exhibit 12F)." (*Id.*)

With respect to Plaintiff's vision complaint, the ALJ stated that during the October 2001 consultative examination with Dr. Kale, Plaintiff's pupils were found to be equal and reactive to light, fundi were benign, and the bilateral extraocular eye motions were intact, with Plaintiff's visual

fields intact, and her sight without glasses at 20/20 bilaterally. (*Id.*)

With respect to Plaintiff's complaints of physical limitations, the ALJ stated that the physical examinations failed to demonstrate any severe restrictions. (*Id.*) The ALJ referred to Dr. Kale's report that Plaintiff's range of spinal motion was normal, her straight leg raising was negative, and the range of motion of her shoulders, elbows, wrists, and fingers was normal. (*Id.*) Based on Dr. Kale's examination, the ALJ stated that Plaintiff's ability to grasp and manipulate objects was normal, and she demonstrated a non-antalgic gait without the use of any assistive devices. (*Id.*) The ALJ concluded that those findings prevented her from assigning more severe limitations to the RFC given and no other medical evidence of record or treating physicians' opinions supported further limitations. (*Id.*) The ALJ found that Plaintiff's complaints were not supported by the overall evidence in the file, and that during her evaluation with Dr. Nelson, she reported being able to do her own daily activities, including showering, dressing, preparing meals, writing letters, reading the paper, and grocery shopping. (R. 45.)

With respect to Plaintiff's mental impairment, the ALJ stated that the mental evaluations did not indicate that Plaintiff suffers from a mental impairment that would further restrict her ability to work. (R. 44.) The ALJ cited Dr. Nelson's October 2, 2001 psychiatric consultative examination, noting that Plaintiff displayed difficulty answering many questions and gave vague answers. (*Id.*) The ALJ also noted Dr. Nelson's observations that Plaintiff had a somewhat depressed affect during the examination, and that there was evidence of "significant social withdrawal." (*Id.*) The ALJ stated that although Plaintiff had some paranoid answers, there was no history of any actual psychotic episodes, and there were no signs of formal thought disorders. (*Id.*) The ALJ also made personal observations about Plaintiff's mental state at the hearing: "During the hearing, it appeared

16

the claimant was somewhat paranoid or suffering from a mental disorder, but the lack of objective medical evidence, and claimant's specific denial of same in her testimony, prevents the undersigned from further restricting the RFC." (*Id.*) The ALJ noted that the record revealed infrequent trips to the doctor for any depressive symptoms, and that at the hearing, Plaintiff stated that she did not need any treatment for depression. (R. 45.)

At step four, the ALJ concluded that Plaintiff could not perform any of her past relevant work. (*Id.*) In reaching that conclusion, the ALJ referred to the VE's testimony that Plaintiff could not perform any of her past relevant work because even her least demanding past relevant job required more than simple, unskilled work. (*Id.*)

Finally, at step five, the ALJ concluded that although Plaintiff's limitations prevent the performance of a full range of light work, there are still a significant number of jobs that Plaintiff can perform. (*Id.*) In reaching that conclusion, the ALJ referred to the VE's testimony that an individual with Plaintiff's vocational characteristics and RFC would be able to perform jobs existing in significant numbers in the economy, specifically, jobs as a cashier or inspector, and assembly work. (*Id.*) Based on her analysis, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 46.)

## LEGAL STANDARD

The Social Security Act provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as here, the Appeals Council has denied the applicant's request for review). Where the ALJ commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986). With respect to the ALJ's conclusions of fact, the reviewing

court's role is limited. There, the role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). In reviewing the Commissioner's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater*, 913 F. Supp. 1210, 1213-14 (N.D. Ill. 1996). Thus, the court does "not substitute [its] own judgment for that of the ALJ." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990); *Edwards v. Sullivan*, 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d at 333. Where conflicting evidence allows reasonable minds to differ, the responsibility for resolving the conflict falls on the ALJ, not the court. *Herr*, 912 F.2d at 181; *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (stating that "[t]he ALJ has the authority to assess the medical evidence and give more weight to evidence he finds more credible"). Where there is a conflict between medical opinions, the ALJ may choose between those opinions, but may not substitute his own lay opinion for that of the medical professionals. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996).

Although the district court's role is limited to determining whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria, that does not mean that the

ALJ is entitled to unlimited judicial deference. Regardless of whether there is adequate evidence in the record to support the ALJ's decision, the ALJ must build an accurate and logical bridge from the evidence to his conclusions, because the court confines its review to the reasons supplied by the ALJ. *Blakes ex rel Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). If the evidence on which the ALJ relied does not support the ALJ's decision, the decision cannot be upheld. *Id.* The ALJ must state reasons for accepting or rejecting "entire lines of evidence," although the ALJ need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333; *see also Young*, 957 F.2d at 393 (ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order to allow for meaningful appellate review). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## DISCUSSION

Plaintiff, proceeding *pro se*, raises a number of challenges to the ALJ's finding that she is not disabled. Specifically, Plaintiff argues: (1) the ALJ did not fully develop the record and erred in failing to call a medical expert to testify (Pl.'s Answer Def.'s Mot. Summ. J. at 14-15 [dkt 25]; Compl. at 1, 12-13 [dkt 1]); (2) the ALJ did not consider the entire record in reaching her determination (Pl.'s Answer at 11, 13; Compl. at 1, 9-11); (3) the ALJ's credibility determination is not supported by substantial evidence (Pl.'s Answer at 13-14; Compl. at 1, 11-12); and (4) the ALJ's RFC finding was not supported by substantial evidence. (Pl.'s Answer at 13.) The Commissioner argues that the ALJ's credibility and RFC findings were supported by substantial evidence. (Def.'s Mem. Supp. Summ. J. at 7.) [Dkt 19.]

**A. Plaintiff's Lack of Representation by Counsel at the Hearing and the ALJ's Development of the Record**

Plaintiff argues that the ALJ erred in failing to develop the record sufficiently. Plaintiff asserts that the ALJ failed to fully question the VE about Plaintiff's impairments, that the medical record was not complete, and that the ALJ erred in failing to call a medical expert to testify. Surprisingly, the Commissioner does not address these arguments, but merely argues that the ALJ's credibility and RFC findings were supported by substantial evidence. (Def.'s Mem. at 7.)[26]

A claimant has a statutory right to counsel at a disability hearing. 42 U.S.C. § 406; 20 C.F.R. §§ 404.1700, 404.1703-1707. However, if properly informed of that right, a claimant may waive her right to counsel. *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir.1991). Waiver of the right to counsel will be deemed invalid unless the waiver was done on a knowing and intelligent basis. *Id.* To ensure a valid waiver, the Seventh Circuit requires that an ALJ explain to the *pro se* claimant: (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorneys fees to 25 percent of past due benefits and required court approval of the fees. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994) (citing *Thompson*, 933 F.2d at 584). When a claimant possesses limited intelligence, it is incumbent upon the ALJ to demonstrate "increased attention toward ensuring that the claimant fully understands these issues." *Vaile v. Chater*, 916 F. Supp. 821, 828-29 (N.D. Ill. 1996). In this case, Plaintiff does not argue that her waiver was invalid.

An ALJ has a basic obligation to develop a full and fair record. *Thompson*, 933 F.2d at 585

---

[26] The Commissioner should note that she will not be permitted to enhance any objections to this Report and Recommendation by adding arguments not previously raised. *See Koken v. Auburn Mfg., Inc.*, 341 F. Supp. 2d 20, 22 (D. Me. 2004).

(citing *Smith v. Secretary of Health, Education & Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)). When a plaintiff proceeds *pro se*, an ALJ has a heightened duty to develop a full and fair record. *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997); *Thompson*, 933 F.2d at 585. The ALJ's duty to develop a full and fair record when a claimant is unassisted by counsel requires that the ALJ "scrupulously and conscientiously [] probe into, inquire of, and explore for all the relevant facts." *Thompson*, 933 F.2d at 585 (quotation omitted). Significantly, the ALJ has the same duty to develop the record when a plaintiff is without counsel regardless of whether the plaintiff's waiver of counsel was valid. *Binion*, 13 F.3d at 245. A claimant is entitled to remand where the ALJ does not develop a full and fair record. *Id.* (citing *Smith*, 587 F.2d at 860).

An ALJ has a "duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527 (c)(3); S.S.R. 96-2p at 4). Courts generally defer to the ALJ's judgment regarding how much evidence to gather, unless a claimant can show a significant omission that was prejudicial. *See Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993) (stating that "[h]ow much evidence to gather is a subject on which district courts must respect the Secretary's reasoned judgment"). An ALJ is required to obtain additional evidence only if the evidence is insufficient to determine whether a claimant is disabled or if the evidence is conflicting. 20 C.F.R. § 404.1527(c)(3). Mere speculation that additional evidence might have been obtained in a case is insufficient. *Schoenfeld v. Apfel*, 237 F.3d 788, 798 (7th Cir. 2001) (quotation omitted).

In this case, Plaintiff was unrepresented at the hearing. (R. 41, 266-67.) Considering the ALJ's duty when a claimant proceeds on a *pro se* basis, the ALJ's development of the record in this case was plainly inadequate. The ALJ should have developed the record more thoroughly regarding

21

both Plaintiff's mental and physical limitations. As to mental limitations, for example, in his summary of findings, Dr. Nelson opined that Plaintiff experiences sporadic depressive and anxiety episodes and has undergone significant social withdrawal. (R. 250.) Dr. Nelson also stated that "[a] question that remains with this case is how many of [Plaintiff's] allegations of betrayal and harassment, etc. are based on reality or how many are products of an increasingly paranoid state of mind." (*Id.*) The ALJ herself questioned Plaintiff's state of mind at the hearing: "During the hearing, it appeared the claimant was somewhat paranoid or suffering from a mental disorder. . . ." (R. 44.) In spite of the questions that remained in the minds of both Dr. Nelson and the ALJ about Plaintiff's mental state, the ALJ did not develop the record any further. The ALJ merely concluded that "claimant's depression does not satisfy the required level of severity under section 12.04" (R. 43), and that "the lack of objective medical evidence, and claimant's specific denial of same in her testimony, prevents the undersigned from further restricting the RFC." (R. 44.) The ALJ did not mention Dr. Nelson's concern about Plaintiff's "increasingly paranoid state of mind." (R. 250.) The ALJ should have developed the record more fully on the issue of Plaintiff's mental state.

In addition, the ALJ failed to develop the record fully regarding Plaintiff's physical impairments. When Plaintiff underwent the physical examination with Dr. Kale on October 2, 2001, Dr. Kale recommended more evaluation and testing of Plaintiff. (R. 255.) Dr. Kale indicated that pulmonary hypertension should be ruled out. (*Id.*) Dr. Kale's clinical impressions included the need for an echocardiogram and CAT-scan of Plaintiff's lung to rule out myopathy. (*Id.*) Apparently, Dr. Kale was under the impression that the additional testing had been ordered by Plaintiff's doctors at Cook County. (*Id.*) Although a year had passed since Dr. Kale's October 2001 examination and the hearing in October 2002, the ALJ did not question Plaintiff at the hearing about whether those

22

tests had been performed or obtain any records to reflect what the testing showed. In spite of the ALJ's reliance on Dr. Kale's examination in reaching her determination, the ALJ failed to mention Dr. Kale's recommendation for further testing. Additionally, Dr. Kale's impressions also included the possibility that Plaintiff's limitations were caused by sickle-cell trait related arthropathies. (*Id.*) Because that might support Plaintiff's complaints of pain in her arms and joints, the ALJ should have pursued that further.

Furthermore, in her decision, the ALJ referred to medical records from 1998 detailing complaints of headaches, dizziness, and nausea, but stated that tests and examinations showed no abnormalities. (R. 44.) On the contrary, an MRI done in 1998 showed some abnormalities and Plaintiff was referred to a neurologist. (R. 178.) The ALJ failed to obtain further evidence or medical records from a neurologist.

Finally, Plaintiff argues that the ALJ erred in failing to call a medical expert to testify at her hearing. (Pl.'s Answer at 14-15.) Although there is no requirement that a medical expert be called to provide an opinion on every single medical document in the record, an ALJ is required to "summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled." *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000). In *Green*, the ALJ discounted the claimant's claims of debilitating pain and limitations because they were disproportionate to the objective medical findings in the record. 204 F.3d at 781. The Seventh Circuit found that instead of summoning a medical expert, the ALJ "played doctor." *Id.* The Seventh Circuit remanded the case to the Commissioner for further proceedings. *Id.* at 782. *Accord Manney v. Barnhart*, 320 F. Supp. 2d 681, 701 (N.D. Ill. 2004) (remanding case to Commissioner because ALJ should have summoned a medical expert).

In this case, the ALJ discounted Plaintiff's complaints of severe pain and limitations on the ground that they were unsubstantiated by the objective evidence. (R. 43.) The ALJ relied on Dr. Kale's physical examination of Plaintiff, but, as discussed above, that examination did not resolve all of the questions about Plaintiff's condition. In his report, Dr. Kale did not interpret the results of all of Plaintiff's testing, such as the MRI, x-rays, CT-Scans, echocardiograms, and blood tests. Dr. Kale did not address the impact of Plaintiff's hypertension or sarcoidosis on her daily living. He could not have addressed Plaintiff's iritis, which was not diagnosed until after Dr. Kale's examination. In this situation, the ALJ should have obtained the testimony of a medical expert.

For these reasons, the ALJ did not fulfill her duty to "scrupulously and conscientiously [] probe into, inquire of, and explore for all the relevant facts," relating to the claim of an unrepresented claimant. *Thompson*, 933 F.2d at 585 (quotation omitted). The ALJ's failure to fully and fairly develop the record requires that this case be remanded.

**B.    The ALJ's Consideration of the Entire Record in Determination**

Plaintiff argues that the ALJ did not consider the entire record in reaching her determination. Plaintiff argues that the ALJ impermissibly relied on the eye examination performed by Dr. Kale during the consultative examination in October 2001, even though she was not diagnosed with iritis in her left eye until ten months after the consultative examination was performed. Plaintiff argues that the ALJ disregarded evidence that was favorable to her, including medical evidence establishing sarcoidosis.

In reaching a decision, an ALJ does not have to discuss every piece of evidence in the record *Herron*, 19 F.3d at 333, but must confront evidence that does not support her conclusion and explain

why it was rejected. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). An "ALJ's decision must be based upon consideration of all the relevant evidence, and the ALJ 'must articulate at some minimal level his analysis of the evidence.'" *Herron*, 19 F.3d at 333 (quoting *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988). An ALJ cannot completely disregard known sources of medical evidence. *Valie*, 916 F. Supp. at 830.

In this case, the ALJ failed to confront evidence that did not support her conclusion. First, the ALJ failed to confront the evidence of Plaintiff's eye problems. Contrary to the ALJ's statement that "[t]here is no other medical evidence of record or treating physicians' opinions to support further limitation" (R. 44), medical records from an August 2002 evaluation at Cook County Hospital reflect Plaintiff's symptoms of blurred vision, inability to open her left eye, and sensitivity to light, and a diagnosis of iritis in Plaintiff's left eye. (R. 242.). At the hearing, when the ALJ asked Plaintiff about her iritis, Plaintiff responded that the condition was not improving and her vision remained blurry. (R. 277-78.) However, the ALJ did not discuss this condition, or the medical records supporting it, in her decision. Instead, the ALJ relied on an eye examination performed by Dr. Kale in October 2001, ten months before the diagnosis. (R. 44, 253.)

Furthermore, the ALJ did not include iritis or Plaintiff's blurred vision in the list of work-related impairments submitted to the VE. (R. 297-98.) When an ALJ relies on the testimony of a VE, ordinarily, the hypothetical question must incorporate all of the claimant's limitations supported by medical evidence in the record. *See Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004); *Kasarsky*, 335 F.3d at 543. Here, the ALJ's hypothetical question to the VE included a number of Plaintiff's limitations, but did not refer to Plaintiff's vision. The Seventh Circuit's decision in the *Indoranto* case speaks directly to this error: "One wonders how someone with daily episodes of

blurred vision could perform the jobs suggested by the VE, such as a cashier or an assembler, which would require attention to visual detail." 374 F.3d at 474. The ALJ never properly considered this medically-documented limitation.

Second, as discussed above, the ALJ failed to consider Dr. Kale's recommendation for further testing to rule out pulmonary hypertension and myopathy, or Dr. Nelson's concern about Plaintiff's "increasingly paranoid state of mind" in reaching her decision. The ALJ also virtually ignored Plaintiff's sarcoidosis diagnosis. At the hearing, the ALJ asked Plaintiff if the Fantus Clinic was treating her sarcoidosis and Plaintiff responded that they were not. (R. 276.) Without explanation, the ALJ dismissed the scarciodsis diagnosis, stating "[w]hile an August 1, 2001 CAT scan indicates findings consistent with sarcoidosis (Exhibit 12 F), the remaining August lab work from Cook County was negative (Exhibit 12 F)." (R. 44.) Also, as discussed above, the ALJ failed to consider the possibility that Plaintiff's limitations were caused by possible sickle-cell trait related arthropathies, as suggested by Dr. Kale. (R. 255.) The ALJ's failure to consider the entire record in reaching her determination requires that this case be remanded.

## C.    The ALJ's Credibility Determination

At the end of her opinion under "Findings," the ALJ stated: "The claimant's complaints of disabling symptoms and limitations are not considered entirely credible for the reasons set forth in the body of this decision." (R. 46.) Plaintiff argues that the ALJ's credibility determination is not supported by substantial evidence because the ALJ did not set forth the reasons why Plaintiff was not "entirely credible." Plaintiff further argues that the ALJ failed to build an accurate and logical bridge between the evidence and her credibility finding. The Commissioner argues that the ALJ's

26

credibility finding was supported by substantial evidence.

An ALJ is required to evaluate a claimant's subjective complaints of pain in determining whether she is disabled, considering both the objective medical evidence, as well as information provided by the claimant, her treating physician, or others. 20 C.F.R. § 404.1529 (b), (c). The ALJ must also evaluate the credibility of the claimant's testimony in light of her (i) daily activities, (ii) the location, frequency, and duration of pain, (iii) precipitating and aggravating factors, (iv) the effects of medication, (v) treatment, (vi) other measures used to relieve pain, and (vii) other factors concerning functional limitations. 20 C.F.R. § 404.1529 (c)(3).

SSR 96-7p requires that the ALJ supply specific reasons for finding that a claimant is not credible. That Regulation states, in relevant part:

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186 at *2. An ALJ's credibility finding is entitled to substantial deference. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). However, to support a determination that a claimant's testimony is not credible, the ALJ should explain how the claimant's allegations are inconsistent with the medical findings in the record. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). In this case, the ALJ cited SSR 96-7p, but merely concluded that "claimant's allegations of disabling symptoms and limitations cannot be accepted" and that "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations." (R. 44, 43.) That conclusion fails to satisfy the requirements of SSR 96-7p. In addition, the ALJ based her credibility determination on a record that was not fully developed. On remand, the ALJ must re-evaluate the Plaintiff's credibility in light of a fully-developed record.

27

**D.     The ALJ's RFC Determination**

Finally, Plaintiff asserts that the ALJ's RFC finding was not supported by substantial evidence. She argues that most of her statements from the questionnaires were omitted from the RFC finding and that the ALJ ignored her symptoms and limitation, including her symptoms of chest pain, dizziness, headaches, and nausea. The Commissioner counters that the ALJ's RFC finding was supported by substantial evidence.

When determining a claimant's RFC, an ALJ applies a legal standard to the medical facts concerning a claimant's functional abilities. *See Peterson v Chater*, 96 F.3d 1015, 1016 (7th Cir. 1996). An ALJ may not "make his own independent medical determinations about the claimant." *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985). *See also Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) (stating that "judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor").

In light of the conclusion that the ALJ did not fully develop the record and failed to consider the entire record in her determination, Plaintiff's RFC will need to be reevaluated on remand after the ALJ properly develops the record. In determining Plaintiff's RFC on remand, the ALJ must consider all of the medical evidence.

**CONCLUSION**

Plaintiff urges that the Commissioner's determination be reversed outright and that the court require the Commissioner to grant Plaintiff benefits. However, it is not clear whether Plaintiff is entitled to benefits. On the other hand, it is clear that the ALJ's opinion does not meet the requirements of the Regulations. Thus, this court respectfully recommends that the Commissioner's

motion for summary judgment be denied, Plaintiff's motion for summary judgment be granted, and the case be remanded to the Commissioner for further proceedings consistent with this opinion. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(b). Failure to file objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this court in the report and recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

Geraldine Soat Brown
United States Magistrate Judge

February 1, 2005